# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIA HER YANG,<br><br>        Plaintiff,<br><br>        v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | Case No.  1:19-cv-00890-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL AND ENTERING JUDGMENT IN FAVOR OF DEFENDANT COMMISSIONER OF SOCIAL SECURITY<br><br>(ECF Nos. 15, 16, 17) |

## I.

## INTRODUCTION

Dia Her Yang ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from depressive disorder, anxiety, and status post right should sprain. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

/ / /

---

[1]  The parties have consented to the jurisdiction of the United States magistrate judge and has been assigned to the magistrate judge for all purposes.  (See ECF Nos. 7, 9, 18.)

## II.

## BACKGROUND

### A.    Procedural History

On June 6, 2015, Plaintiff filed a Title II application for disability insurance benefits, and on June 9, 2015, filed a Title XVI application for supplemental security income, alleging a period of disability beginning on October 1, 2013.  (AR 127-28, 245-52.)  Plaintiff's claim was initially denied on August 18, 2015, and denied upon reconsideration on October 28, 2015.  (AR 165-70, 172-78.)  On December 9, 2015, Plaintiff requested hearing before an Administrative Law Judge, and on September 11, 2017, Plaintiff appeared before Administrative Law Judge Ruxana Meyer (the "ALJ") for a hearing.  (AR 44-78, 179.)  On February 5, 2018, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 18-37.)  On March 11, 2019, the Appeals Council denied Plaintiff's request for review.  (AR 5-12.)

Plaintiff filed this action on June 28, 2019, and seeks judicial review of the denial of her application for disability benefits.  (ECF No. 1.)  On February 25, 2020, Plaintiff filed a brief in support of remand.  (ECF No. 15.)  On March 23, 2020, Defendant filed a brief in opposition. (ECF No. 16.)  On April 6, 2020, Plaintiff filed a reply brief.  (ECF No. 17.)

### B.    Hearing Testimony

Plaintiff testified at the September 11, 2017 hearing with the assistance of counsel and an interpreter.  (AR 44-78.)  Plaintiff only speaks minimal English, and her primary language is Hmong.  (AR 46.)  Plaintiff spoke a little English at her former job.  (Id.)  Plaintiff did not recall the year she came to the United States.  (AR 47.)  Plaintiff indicated she has a driver's license but somebody else drove her to the hearing.  (Id.)

Plaintiff stated she was born on February 9, 1961, but was unsure of how old she was. (AR 53.)  Plaintiff lives with her son, and although she was unsure how old he is, she confirmed he is over eighteen (18).[2]  (AR 53-54.)  Plaintiff's son has a medical illness, had a brain surgery, and suffers from depression.  (AR 54.)  The son does not work, and Plaintiff supports herself

---

[2]  Although at this point Plaintiff indicated this was her only son, in later testimony it appears she refers to another son that does not live with her, but visits to assist her.  (AR 53-54, 63.)

1  from her son's disability income related to the brain surgery.  (AR 54-55.)

2  Plaintiff testified she never attended school.  (AR 55.)  Plaintiff spoke some English at

3  her previous job at Busseto Foods, where she put sticker labels on meat packages.  (AR 55-56.)

4  Plaintiff worked placing labels on jewelry at another position.  (AR 56-57.)  While a form

5  indicated Plaintiff lifted ten (10) to twenty (20) pounds at the jewelry company, Plaintiff

6  answered that the packages usually weighed one (1) pound or less.  (AR 58.)  At the meat

7  packing job, the men would do the lifting of objects, and Plaintiff only put on the stickers, as the

8  supervisor didn't make her lift objects.  (Id.)

9  The ALJ inquired about a wrist brace that Plaintiff was wearing at the hearing, and

10  Plaintiff answered it was prescribed, but did not remember when or the name of the doctor that

11  prescribed it, although stated the doctor was located in Fresno.  (AR 59.)  Plaintiff confirmed that

12  she got the wrist brace more than three years before the hearing and that she had it during the

13  time she worked at Busseto Foods, however, Plaintiff stated she was not allowed to wear it

14  during the day at work, but now wears it every day and night.  (AR 60.)

15  When asked why she left the position at Busseto Foods, Plaintiff stated it was because

16  she got injured at work.  (AR 61.)  Plaintiff fell and injured her neck, shoulder, and elbow, and

17  afterwards felt like she was going to throw up, and so the supervisor took her to the hospital.

18  (Id.)  Plaintiff clarified that she wears the wrist brace because of numbness in the right hand that

19  began more than three (3) years before.  (AR 62.)

20  Plaintiff takes several kinds of medications for pain but did not have them with her to

21  specify which ones.  (Id.)  Plaintiff indicates another son that lives within a few minutes of

22  driving distance helps her with taking medication, and he visits every day to cook her food and to

23  tell her the medication to take.  (AR 63.)

24  The ALJ then asked if Plaintiff's counsel would like to examine Plaintiff, and requested

25  counsel to inquire about a cane.  (Id.)  Plaintiff's counsel then examined Plaintiff.  Plaintiff

26  answered that the cane she brought with her was used to support herself and prevent her from

27  falling due to pain in the right leg.  (AR 64.)  When asked how long she had the cane, Plaintiff

28  answered that it belonged to her mother and Plaintiff uses it for balance.  (Id.)  Plaintiff stated

1  she had been using the cane for one year.  (AR 65.)  Plaintiff's doctor does not know that she is

2  using the cane.  (Id.)

3      Plaintiff confirmed she has problems holding onto items with her right hand.  (Id.)  After

4  some confusion regarding the questions, Plaintiff stated her right arm and hand have numbness

5  and pain.  (AR 66-67.)  Plaintiff also confirmed neck pain.  (AR 67.)

6      Plaintiff confirmed she is seeing a therapist or psychologist, Dr. Popper, but was unsure

7  of how long she had been seeing the doctor.  (Id.)  After Plaintiff initially stated she does not still

8  have problems with mental health in an apparent problem with the translation, counsel further

9  inquired as to why the doctor said that even with medication, Plaintiff still has depression.  (AR

10  67-68.)  Plaintiff answered that because her son had brain surgery, and a lot of other things,

11  Plaintiff suffers from depression.  (AR 68.)

12      The Vocational Expert Cathleen Spencer (the "VE") testified.  (AR 69.)  The ALJ

13  presented hypotheticals reflecting the same age, education, and work experience as the Plaintiff.

14  (AR 70.)  The first hypothetical assumed an individual that could perform at all exertional levels,

15  and could understand, remember, and carry out simple instructions, and the VE testified such

16  person could perform both prior jobs in Plaintiff's past work.  (Id.)

17      The second hypothetical assumed an individual with the same capacity as the first but

18  that could perform frequent pushing and pulling with the right upper extremity, and could

19  perform frequent overhead reaching with the right upper extremity.  (AR 70.)  After confirming

20  Plaintiff is in fact right-handed, the VE testified that Plaintiff could not perform any past work,

21  but could perform work in the national or regional economy, including machine packager with

22  69,000 jobs in the national economy, housekeeper with 135,000 jobs in the national economy,

23  and industrial cleaner with 12,000 jobs in the national economy.  (AR 71-72.)

24      The third hypothetical assumed an individual that could lift fifty (50) pounds

25  occasionally, lift or carry twenty-five (25) pounds frequently, stand and/or walk six (6) out of

26  eight (8) hours, sit six (6) out of eight (8) hours, could perform frequent pushing or pulling with

27  the right, dominant upper extremity, could perform frequent overhead reaching with the right,

28  upper extremity, and could do simple work.  (AR 72.)  The VE testified that the same jobs

1  previously identified for hypothetical two would be available to hypothetical three in the same

2  numbers.  (Id.)

3          The fourth hypothetical assumed the same limitations as hypothetical three in addition to

4  requiring no contact with the general public and few changes in the work setting.  (AR 72-73.)

5  The VE testified that the jobs available to hypothetical three would also be available to

6  hypothetical four in the same numbers.  (AR 73.)

7          The fifth hypothetical assumed the same limitations as hypothetical four in addition to a

8  need to be off-task twenty-five percent (25%) of the day.  (Id.)  The VE testified that such person

9  could not perform any competitive work in the national or regional economy.  (Id.)

10         The ALJ then inquired about the impact of an English language barrier and the VE

11 testified that such language barrier would reduce the number of jobs available for each

12 hypothetical by sixty percent (60%).  (AR 73-74.)

13         Counsel then examined the VE.  (AR 74.)  Counsel presented a modified hypothetical

14 three with the overhead reaching limitation changed to no overhead reaching with the right upper

15 extremity, reaching out with the right upper extremity limited to occasional handling, and

16 fingering limited to occasional.  (Id.)  The VE testified that such person could not perform any of

17 the previously identified jobs.  (Id.)  The VE also confirmed that such person would have light

18 and sedentary work available, such as usher with 5,000 jobs in the national economy, or

19 traditional sandwich board carrier with 1,000 jobs in the national economy.  (AR 74-75.)  If

20 confined to the regional numbers, the VE testified that the number of available sandwich board

21 carrier jobs would number three-hundred (300) in California.  (AR 75.)  The VE stated an

22 English language barrier would reduce the available light and sedentary jobs by sixty percent

23 (60%).  (Id.)

24         Counsel then presented a hypothetical person with the same limitations but with a poor

25 ability to sustain focused attention and a routine on a normal basis and a poor ability to maintain

26 social norms and adapt to stress, specified to cause the individual to be off task twenty percent

27 (20%) of the time.  (AR 75-76.)  The VE testified that such person could not perform any

28 competitive work.  (AR 76.)

Counsel offered a closing statement emphasizing that: the opinion of Plaintiff's psychologist, Dr. Mark Popper, was supported by substantial evidence; that Plaintiff has ongoing mental health treatment with Dr. Popper and the Center for New Americans where Plaintiff received one-on-one therapy with a licensed clinical social worker; and the report supports a finding that Plaintiff would be off task at least twenty percent (20%) of the workday, that she would be unable to adapt to stresses or social norms, and as a result would be incapable of performing her past work or any other work as normally found.  (AR 77.)

### C.      The ALJ's Findings of Fact and Conclusions of Law

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2018.

- Plaintiff has not engaged in substantial gainful activity since the alleged onset date of October 11, 2013.

- Plaintiff has the following severe impairments: depressive disorder, anxiety, and status post right shoulder sprain.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

- Plaintiff has the residual functional capacity to perform work as follows: lift or carry 50 pounds occasionally and 25 pounds frequently; stand or walk 6 out of 8 hours and sit for 6 out of 8 hours; perform frequent overhead reaching, pushing and pulling with the right dominant upper extremity; can understand, remember, and carry out simple instructions; and can do work that involves no contact with the general public and few changes in the work setting.

- Plaintiff is unable to perform any past relevant work.

- Plaintiff was born on September 2, 1961, and was 52 years old, which is defined as a an individual closely approaching advanced age, on the alleged disability onset date.  The Plaintiff subsequently changed age category to advanced age.

- Transferability of job skills is not an issue in this case because the Plaintiff's past relevant work is unskilled.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from October 11, 2013, through the date of the ALJ's decision, February 5, 2018.

(AR 24-37.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[3] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to

---

[3] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. § 404.1501 et seq., and Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq. The regulations are generally the same for both types of benefits. Further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

1   perform his or her past relevant work? If so, the claimant is not disabled. If not,
2   proceed to step five.

3   Step five: Does the claimant's RFC, when considered with the claimant's age,
    education, and work experience, allow him or her to adjust to other work that
4   exists in significant numbers in the national economy? If so, the claimant is not
    disabled. If not, the claimant is disabled.

5   Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

6       Congress has provided that an individual may obtain judicial review of any final decision

7   of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).

8   In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

9   Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

10  disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

11  Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a

12  scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

13  (internal quotations and citations omitted).   "Substantial evidence is relevant evidence which,

14  considering the record as a *whole*, a reasonable person might accept as adequate to support a

15  conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

16  Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

17      "[A] reviewing court must consider the entire record as a whole and may not affirm

18  simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

19  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

20  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

21  for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

22  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

23  upheld.").

24                                        **IV.**

25                          **DISCUSSION AND ANALYSIS**

26      Plaintiff argues the ALJ erred by: (1) rejecting the opinions from Plaintiff's treating

27  orthopedist Dr. Mochizuki, and Plaintiff's treating psychotherapist Dr. Popper, without proper

28  evaluation as required by the regulations; and (2) failing to consider a closed period of disability

for the period of time exceeding twelve (12) months, during which Plaintiff alleges she was limited to a range of sedentary to light work.  (Pl.'s Opening Br. ("Br.") 1, ECF No. 15.)

### A.    The ALJ's Weighing of the Medical Opinions was not Erroneous

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians."  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)); see also Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) ("While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician.").

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  Garrison, 759 F.3d at 1012 (citing 20 C.F.R. § 404.1527(d)(3)).  The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  "The weight afforded a non-examining physician's testimony depends 'on the degree to which [he] provide[s] supporting explanations for [his] opinions.' "  Garrison, 759 F.3d at 1012 (citations omitted).

The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  It is the ALJ's responsibility to consider inconsistencies in a physician opinion and resolve any ambiguity.  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999).  The ALJ can meet her "burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen, 779 F.2d

1403, 1408 (9th Cir. 1989)).

      1.    The ALJ did not Err in Weighing Dr. Mochizuki's Opinion

The Court first summarizes the relevant treatment records.

      a.    **Dr. Mochizuki's Medical Treatment Records**

On June 2, 2014, Plaintiff was seen by Dr. Mochizuki who noted August 14, 2013 x-rays of the right shoulder and elbow demonstrated a slightly diminished subacromial space with a type II acromion, calcification measuring 2mm adjacent to the coronoid, and that an April 14, 2014 MRI of the shoulder demonstrated degenerative signal in the superior labrum.  (AR 475-76.)  Dr. Mochizuki assessed a cervical strain, impingement syndrome of the right shoulder with a probable tear of the labrum, and a possible coronoid fracture of the right elbow with tear of the medial ulnar collateral ligament.  (AR 478.)  Dr. Mochizuki precluded Plaintiff from carrying more than 10 pounds with the upper right extremity, pushing/pulling more than 10 pounds, or working above shoulder level.  (AR 479.)  Further MRIs were recommended with follow-up in four weeks.  (Id.)

Following a June 16, 2014 MRI of the right elbow that revealed an interstitial tear of the common extensor tendon and an osteochondral lesion of the posterior capitellum, on June 30, 2014, Dr. Mochizuki recommended a corticosteroid injection, but noted Plaintiff did not understand the treatment recommendations because of a language barrier and recommended an interpreter accompany the patient for a follow-up visit three weeks later.  (AR 470-72.)  Dr. Mochizuki again noted a cervical strain, impingement syndrome of the right shoulder with probable tear of labrum, and a possible coronoid fracture of the right elbow with tear of the medial ulnar collateral ligament.  (AR 472.)  Dr. Mochizuki recommended precluding Plaintiff from carrying more than ten pounds with the upper right extremity, pushing/pulling with more than ten pounds of force, or working at or above the shoulder level of the right arm.  (Id.)

On July 21, 2014, Plaintiff presented before Dr. Mochizuki who observed a positive Hawkins test, positive O'Brien's test, positive Speed's test, tenderness to palpation over the shoulder region, and reduced motor strength in the right extremity.  (AR 405.)  Dr. Mochizuki again assessed a cervical strain, impingement syndrome with probable tear of the labrum, a

possible coronoid fracture of the right elbow with tear of the medial ulnar ligament, an interstitial tear of the common extensor tendon, and an osteochondral lesion of the posterior capitellum. (AR 405-406.)  Plaintiff was prescribed tramadol, and the doctor opined Plaintiff was precluded from carrying more than 10 pounds with the upper right extremity, pushing or pulling more than ten pounds, or working at or above the shoulder level.  (AR 406.)  Dr. Mochizuki also noted Plaintiff was unsure whether she would like a corticosteroid injection, and stated: "No further follow-up visits have been scheduled for Ms. Yang.  She will be managed conservatively without any further medical treatment from me."  (AR 406.)

On August 21, 2014, Dr. Mochizuki made similar findings and recommendations as previous exams, in addition to completing a request for authorization for an ultrasound-guided corticosteroid injection of the right shoulder with a scheduled follow-up four weeks later.  (AR 458-59.)  On September 15, 2014, Dr. Mochizuki administered the injection.  (AR 453.)  Dr. Mochizuki noted Plaintiff was to return in the next two weeks before traveling to Laos to reexamine the shoulder if she were feeling any side effects, and would otherwise return in December of 2014 for a follow-up.  (AR 456.)

On December 22, 2014, Plaintiff again presented to Dr. Mochizuki and reported that the injection made the right shoulder feel better for approximately two weeks before pain returned.  (AR 449.)  Dr. Mochizuki recommended arthroscopic repair of the right shoulder and opined that Plaintiff was precluded from working at or above shoulder level, or carrying, pushing, or pulling more than ten (10) pounds.  (AR 451.)  Dr. Mochizuki again noted that Plaintiff should have an interpreter with her to understand the ramifications of surgery and recommended a follow-up in three weeks.  (Id.)

On February 2, 2015, Plaintiff met with Dr. Mochizuki for the final time.  (AR 444.)  Plaintiff stated she was afraid to have surgery because her niece had surgery on her right upper extremity and had lost use of her hand.  (Id.)  The assessment remained unchanged from prior examinations: (1) cervical strain; (2) impingement syndrome of right shoulder, with probable tear of labrum; (3) possible coronoid fracture of the right elbow with tear of the medial ulnar collateral ligament; (4) osteochondral lesion of the posterior capitellum, right elbow; and (5)

interstitial tear of the common extensor tendon.   (AR 445-46.)   Plaintiff requested a corticosteroid injection, and once the injection was completed, Plaintiff would be "declared permanent and stationary." (AR 446.)  A follow-up was to be conducted in four weeks. (Id.)

### b.    The ALJ's Weighing of Dr. Mochizuki's Opinions

The ALJ gave little weight to the medical opinions that were issued from multiple medical professionals as part of Plaintiff's workers' compensation process, which included Dr. Mochizuki's opinion.  The ALJ stated:

> As part of the workers' compensation process, the claimant [obtained] several different modified work slips including no working at or above shoulder level with the right arm . . . no lifting, pushing, or pulling over 10 pounds . . . a 10 pound restriction with no reaching above the shoulders on the right . . . a 10 pounds restriction with limited use of the right arm . . . a 30 pounds lifting, pushing, and pulling restriction with no reaching above the shoulders . . . no lifting more than 20 pounds and no pushing or pulling more than 30 pounds . . . Little weight is given to these opinions because they are temporary in nature and a stated duration of this activity was not given.  Additionally, records after the claimant stopped seeing the worker's compensation providers indicate her shoulder pain was only intermittent [AR 654[4]].  The reduction to 10 pounds is also not consistent with the degree of changes on imaging of the shoulder or elbow and therefore appears to be based primarily on subjective complaints of pain [AR 476, 488, 489-90; 613[5]].  Accordingly, little weight is given as the claimant's mild reduction in strength and limited shoulder range of motion have been accounted for with the reduction to a reduced range of medium work as described in the residual functional capacity above.

(AR 32-33.)

---

[4]  Here, the ALJ cites to an exam by Dr. Yang on April 4, 2016.  (AR 654.)  Dr. Yang noted that Plaintiff's shoulder pain is intermittent, that "[s]he was recommended to have surgery and she refused," and that "there is not much more to offer[] for she already completed shoulder work up and refused surgery . . . [s]he only wants medical therapy."  (Id.)

[5]  Here the ALJ cites the April 14, 2014 MRI of the shoulder which showed an intact rotator cuff and degenerative signal of the superior labrum without evidence of displaced tear.  (AR 489-92.)  The ALJ cites a record from the first visit with Dr. Mochizuki on June 2, 2014, wherein previous imaging results were summarized as follows: "X-rays of the cervical spine include AP and lateral views, taken on August 14, 2013.  The x-rays demonstrate straightening of the normal cervical lordosis.  X-rays of the right shoulder demonstrate a slightly diminished subacromial space with a type II acromion.  X-rays of the right elbow demonstrate a calcification measuring 2mm adjacent to the coronoid.  It is unclear whether this represents an osteophyte or possible fracture."  (AR 475-76.)  The ALJ also cites the June 16, 2014 MRI which found: (1) small osteochondral lesion of the posterior capitulum at the radiohumeral joint with no other significant areas of abnormal signal; (2) ulnohumeral and radiosigmoid spaces grossly preserved; (3) ulnar collateral ligament and annular ligament intact; (4) tendons of the medial, lateral, anterior, and posterior compartments intact; (5) no significant bursal or soft tissue abnormality; (6) severe tendinosis/interstitial tear of the common extensor tendon; (7) no effusion.  (AR 488.)  The June 16, 2014 impressions were: (1) osteochondral lesion of the posterior capitulum; and (2) interstitial tear of the common extensor tendon.  (Id.)  The ALJ also cites the May 26, 2015 x-ray results which were compared with the April 14, 2014 MRI, and the impressions were noted as: (1) normal right shoulder; and (2) abnormalities visualized on the MRI were not visualized in the x-ray.  (AR 613.)

      **c.**      **Summary of the Plaintiff's Challenges to the ALJ's Findings**

Plaintiff contends the ALJ's rejection of Dr. Mochizuki's opinion for lack of a stated duration is erroneous because as for Plaintiff's inability to work at or above shoulder level, Dr. Mochizuki opined that Plaintiff's limitations were "permanent and stationary, and thus the stated duration of this activity was given, and the restriction was permanent." (Br. 13; AR 446.) Similarly, Plaintiff argues the ALJ's assertion that Plaintiff's shoulder pain was subsequently described as "intermittent" was not a legitimate reason for rejecting the reaching limitations because there is no indication that the frequency of Plaintiff's intermittent pain was so limited that the opined restrictions would no longer apply, particularly as intermittent pain throughout the day or only with use does not contradict Dr. Mochizuki's opinion. (Br. 13.) In this regard, Plaintiff further argues the longitudinal record contradicts the ALJ's assumption that Plaintiff's pain lessened or improved to a degree that renders Dr. Mochizuki's opinion irrelevant, emphasizing that in addition to ongoing treatment with medications including lidocaine, acetaminophen with codeine, tramadol, prednisone, and gabapentin (AR 545-46, 576-77, 581-82, 598, 638, 644, 648, 656-57, 666-67), Plaintiff reported persistent right shoulder pain that was a stressor and interfered with sleep, in addition to being regularly observed rubbing her right shoulder and arm during therapy sessions due to pain (AR 704, 712, 720, 721, 729, 730, 732). Thus, consistent Dr. Mochizuki's opinion of permanent reaching restrictions, there was never any indication that the shoulder pain and limitations ever improved to a point that would allow greater functionality. (Br. 14.) Finally, Plaintiff argues the ALJ improperly speculated that the degree of imaging does not support Dr. Mochizuki's opined limitations (AR 33), as the ALJ is not a medical expert and is not qualified to interpret such medical imaging, and the ALJ's "lay opinion" is contradicted by Plaintiff's treating orthopedist and at least three other providers who assessed the right-arm functional limitations.

      **d.**      **The ALJ's Assignment of Reduced Weight to Dr. Mochizuki's Opinion for Lack of Stated Duration and for Plaintiff's Description of Shoulder Pain as Intermittent was not Error**

The Court first considers two of the arguments offered by Plaintiff for why the ALJ's weighing of Dr. Mochizuki's opinion was error: (1) that the ALJ's rejection of Dr. Mochizuki's

1   opinion for a lack of stated duration was improper because Dr. Mochizuki in fact opined that

2   Plaintiff's limitations were permanent and stationary; and (2) that the ALJ's assertion that

3   Plaintiff's shoulder pain was subsequently described as "intermittent" was not a legitimate

4   reason for rejecting the reaching limitations because there was no indication that the frequency of

5   pain was so limited as to make the opined restrictions no longer applicable.  (Br. 13; AR 446.)

6       Defendant responds that the ALJ properly relied on records demonstrating that after

7   Plaintiff stopped seeing the workers' compensation providers, Plaintiff indicated her shoulder

8   pain was only intermittent and thus the ALJ found the records were not consistent with the extent

9   of Dr. Mochizuki's opinions.  (Opp'n 15.)  Defendant highlights that Dr. Mochizuki's last

10  examination of Plaintiff was February 2, 2015, and the last examination with any workers'

11  compensation provider was March 2, 2015 (AR 443, 446, 493).  (Opp'n 15.)  The ALJ discussed

12  that beginning in March of 2015, Plaintiff was mainly treated by her primary care providers, who

13  at times found through examinations that Plaintiff showed some limited range of motion with

14  discomfort and/or pain in the right shoulder (AR 30, 545, 576, 666),[6] and as further noted by the

15  ALJ, other examinations showed a mild reduction in strength of 4 out of 5, but normal gait and

16  no other motor or sensory deficits (AR 30, 581, 585, 592, 596, 600, 637, 643, 647, 660).[7]

17  Defendant argues that a review of these treatment records illustrate that at many appointments,

---

[6]  On March 17, 2015, Plaintiff complained of elbow and shoulder pain "more day and night," and showed limited range of motion ("ROM") with discomfort in the right shoulder on exam.  (AR 545.)  On May 4, 2015, presented to Dr. Yang as a new patient, complaining of heat intolerance, insomnia, and dry eyes.  (AR 574-78.)  The physical exam noted right shoulder ROM limited by pain.  (AR 576.)  On October 27, 2015, Plaintiff complained of shoulder pain stating she could not put her wrist behind her back, described as moderate pain, and limited range of motion. (AR 668.)  Plaintiff presented with ROM limited to less than 90 degrees.  (AR 666.)  Regarding these records, the ALJ stated: "Beginning in 2015, the claimant was mainly treated by her primary care provider who noted she had limited range of motion with discomfort in her right shoulder . . . consistent with prior exams but also accounted for in the residual functional capacity.  (AR 30.)  The ALJ went on to state the "claimant was able to lift her shoulder above 90 degrees but had some limitations going backwards [AR 600]."  (AR 30.)  That is an accurate statement as to September 25, 2015, however as just stated, she could not extend past 90 degrees on October 27, 2015.  (AR 600, 666.)  Nonetheless, the differences may provide support to the ALJ's reliance on the intermittent nature of the shoulder pain.

[7]  The ALJ's representation of these records is largely accurate.  Plaintiff presented with a reduction of strength of 4 out of 5 and normal gait and no motor sensory deficits on May 18, 2015, June 18, 2015, July 22, 2015, and August 17, 2015 (though no express statement of normal or abnormal gait on August 17); and the same on September 25, 2015, February 3, 2016, August 1, 2016, and February 6, 2017, though there are no express statements of the presence or non-presence of motor or sensory deficits in the 2016 and 2017 reports.  (AR 581, 585, 592, 596, 600, 637, 643, 647, 660).

1   Plaintiff complained of other medical issues and did not always complain of shoulder pain or

2   limited range of motion of the upper extremity, and thus the ALJ's conclusion was consistent

3   with the Plaintiff's report on April 4, 2016, to Dr. Yang, that her shoulder pain was intermittent

4   (AR 30, 33, 654), and the ALJ ultimately found that to the extent that Plaintiff's upper right

5   extremity caused limitations consistent with these prior examinations, they were accounted for

6   by the limited medium exertional limitations the ALJ assessed in the RFC, which limited

7   Plaintiff to frequent overhead reaching, pushing and pulling with the right dominant upper

8   extremity.  (Opp'n 15-16.)

9       Defendant also argues the ALJ properly gave great weight to the opinions of State agency

10  physicians Frankel and Bugg, who opined on Plaintiff's physical condition and found she could

11  perform medium work with a limitation to frequent pushing and pulling and frequent overhead

12  reaching with the upper right extremity (AR 33, 99-106, 135-40).  (Opp'n 18.)  Defendant

13  contends the ALJ properly relied on these physicians because they were familiar with the Social

14  Security Administration's precise disability guidelines and the ALJ noted their opinions were

15  consistent with the medical record as a whole because even though they did not have the

16  opportunity to review later received medical evidence, there had been little change in Plaintiff's

17  status.  (AR 33, 574-615, 635-669.)[8]

18      In reply, Plaintiff reemphasizes the longitudinal record contradicts the ALJ's assumption

19  that Plaintiff's pain lessened or improved to a degree that renders Dr. Mochizuki's opinion

20  irrelevant, as she reported persistent pain (AR 704, 712, 720, 721, 729, 730, 732),[9] and thus

21

---

22  [8]  Dr. Frankel rendered an opinion on July 24, 2015 and appears to have reviewed medical evidence dating up to
    June 18, 2015.  (AR 99-106.)  Dr. Bugg rendered an opinion on October 28, 2015, and appears to have reviewed

23  medical evidence dating up to September of 2015.  (AR 135-40.)  The Court's review has confirmed the records do
    not reflect any significant detrimental changes that stand out from prior dates.   Plaintiff does not specifically argue

24  that Dr. Frankel or Bugg did not have access to records that reflect significant changes or that would have materially
    affected their ultimate findings.

25  [9]  On June 19, 2015, Plaintiff reported shoulder pain (AR 730-32); on July 28, 2015 Plaintiff reported persistent pain

26  in shoulder and difficulty carrying more than a gallon of water (AR 729); on April 25, 2016, Plaintiff reported
    shoulder pain and trouble functioning with the right arm (AR 721); on May 11, 2016, Plaintiff reported pain in the

27  shoulders (AR 720); on August 8, 2016, Plaintiff was observed massaging her shoulder due to pain during a therapy
    session (AR 712); on December 30, 2016, Plaintiff was observed as tearful and constantly rubbing the right shoulder

28  during a psychology appointment (AR 704).

1  consistent with Dr. Mochizuki's permanent reaching restrictions, there is no indication that the

2  shoulder pain and limitations ever improved to a point allowing greater functionality.  (Reply 5.)

3           i.      Lack of Stated Duration

4        First, while Plaintiff emphasizes Dr. Mochizuki issued a permanent and stationary

5  opinion, the Court notes that "permanent and stationary" is a "term of art relevant to workers'

6  compensation law under California law," and a "disability is considered permanent and

7  stationary for California workers' compensation purposes after the employee has reached

8  maximum medical improvement or his or her condition has been stationary for a reasonable

9  period of time." Viramontes v. Astrue, No. 2:09-CV-00248 WBS KJ, 2010 WL 3212861, at *7

10  (E.D. Cal. Aug. 12, 2010) (internal citations and quotation marks omitted).[10]

---

[10]  While not expressly raised by Plaintiff in briefing, an ALJ may err where the ALJ fails to translate workers' compensation medical opinions' terms of art.  "While workers' compensation ratings are not controlling in disability cases decided under the Social Security Act, the ALJ must consider workers' compensation medical opinions and must 'translate' workers' compensation terms of art in order to accurately assess the implications of those opinions for the social security disability determination." Fuentes v. Comm'r of Soc. Sec. Admin., No. SACV 11-1960 AJW, 2013 WL 140290, at *4 (C.D. Cal. Jan. 7, 2013) (citing Booth v. Barnhart, 181 F.Supp.2d 1099, 1105–1109 (C.D. Cal.2002); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir.1988); Coria v. Heckler, 750 F.2d 245, 247–248 (3d Cir.1984)); see also Withrow v. Colvin, No. CV 13-1959-AS, 2015 WL 58727, at *5 (C.D. Cal. Jan. 5, 2015) ("However, the ALJ properly noted that Dr. Piasecki's findings were based on the criteria used for evaluating a worker's compensation claim which differ from the criteria used for a finding of disability under the Social Security Act."), aff'd, 672 F. App'x 748 (9th Cir. 2017).  The Fuentes court found that "[a]lthough the ALJ noted that 'Dr. Brown said the claimant remained permanent and stationary,' the ALJ did not explain the significance of this conclusion for purposes of the social security disability evaluation, nor did he explain how he interpreted or weighed Dr. Brown's opinions that plaintiff was 'temporarily totally disabled' or Dr. Brown's workers' compensation disability ratings." Fuentes, 2013 WL 140290, at *4.  Of note, in Fuentes, the court found there was no conflicting opinion, and thus the treating workers' compensation opinion was entitled to controlling weight, and while the ALJ summarized the report, the ALJ failed to "provide any reasons, let alone clear and convincing reasons, for rejecting the opinion." Id.  The Ninth Circuit in Desrosiers, cited in Fuentes, held that given the differences in categories of work between the workers' compensation law and Social Security Act, it was "clear from the record that the ALJ did not adequately consider this distinction," because the ALJ used the incorrect definition during the hearing, and inaccurately stated that Plaintiff's alleged inabilities were contradicted by all examining physicians, when the workers' compensation doctors were not in fact contradicted. Desrosiers, 846 F.2d at 576 (9th Cir. 1988).  The crux of the caselaw in this area appears to boil down to require an ALJ to evaluate a workers' compensation opinion with a similar methodology and deference used when evaluating other types of medical opinions, which ultimately *may* require the ALJ to demonstrate they considered the distinctions between the statutory schemes, or at least demonstrate an understanding of the distinctions.  See de Orozco v. Comm'r of Soc. Sec., No. 1:18-CV-00817-SAB, 2019 WL 2641490, at *12 (E.D. Cal. June 27, 2019).

The ALJ's opinion does not expressly reference the term "permanent and stationary."  In the portion of the opinion weighing Dr. Mochizuki's and the other workers' compensation opinions, the ALJ notes that "[a]s part if the workers' compensation, the claimant [received] several different modified work slips," before providing the three reasons for rejecting the opinions.  (AR 32-33.)  In assigning reduced weight, the ALJ stated little weight was given in part because the opinions were "temporary in nature and a stated duration of this activity was not given."  (AR 33.)  An argument could be made that the opinion does not demonstrate the ALJ fully considered the distinctions between the schemes.  However, the ALJ need not expressly translate such terms, and again, the crux of the caselaw appears only to require weighing the workers' compensation opinions in the same manner as other medical opinions,

Of note, within the records from Dr. Mochizuki, on July 21, 2014, Plaintiff presented before Dr. Mochizuki who observed a positive Hawkins test, positive O'Brien's test, positive Speed's test, tenderness to palpation over the shoulder region, and reduced motor strength in the right extremity.  (AR 405.)  Dr. Mochizuki again assessed a cervical strain, impingement syndrome with probable tear of the labrum, a possible coronoid fracture of the right elbow with tear of the medial ulnar ligament, an interstitial tear of the common extensor tendon, and an osteochondral lesion of the posterior capitellum.  (AR 405-406.)  Plaintiff was prescribed tramadol, and the doctor opined Plaintiff was precluded from carrying more than 10 pounds with the upper right extremity, pushing or pulling more than ten pounds, or working at or above the shoulder level.  (AR 406.)  Dr. Mochizuki also noted Plaintiff was unsure whether she would like a corticosteroid injection, and wrote: "No further follow-up visits have been scheduled for Ms. Yang.  She will be managed conservatively without any further medical treatment from me." (AR 406.)

On February 2, 2015, Plaintiff met with Dr. Mochizuki for the final time.  (AR 444.) Plaintiff stated she was afraid to have surgery because her niece had surgery on her right upper extremity and had lost use of her hand.  (Id.)[11]  The assessment remained unchanged from prior

---

which the ALJ did, while also expressly recognizing the opinions were issued in the workers' compensation context. See Bowser v. Comm'r of Soc. Sec., 121 F. App'x 231, 242 (9th Cir. 2005) ("[T]he objective medical findings contained in such opinions are to be evaluated as any other medical opinion [and] [t]he ALJ's opinion should reflect, however, that the ALJ properly considered the pertinent distinctions between the two schemes . . . In this case, although the ALJ did not explicitly translate Dr. White's and Dr. Edington's findings from Social Security parlance, his reasoning can be gleaned from his opinion."); see also Holloway v. Berryhill, No. EDCV 16-93 FFM, 2017 WL 5508512, at *5 (C.D. Cal. Nov. 16, 2017) (While holding the ALJ's rejection of a workers' compensation opinion simply because it was generated in the workers' compensation process was not a permissible reason to reject the opinion, the error was harmless because "opinion that plaintiff is permanent and stationary is only a finding that plaintiff's condition is not expected to improve.  It does not show that plaintiff is more limited than assessed in the RFC.").  Further, Plaintiff did not expressly challenge any potential failure to describe or demonstrate taking account of the difference between workers' compensation and Social Security Act terminology, and therefore has waived the issue.  Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014).

[11] The Court notes that additionally, within the record cited by the ALJ concerning intermittent shoulder pain dated April 4, 2016, Dr. Yang wrote that Plaintiff's shoulder pain is intermittent, that "[s]he was recommended to have surgery and she refused," that she continues to have shoulder pain, and that "there is not much more to offer[] for she already completed shoulder work up and refused surgery . . . [s]he only wants medical therapy."  (AR 654.)  Dr. Yang also recorded that Plaintiff was not taking her blood pressure medication, and made a notation under "Diagnosis" of "Plaintiff's noncompliance with other medical treatment and regimen."  (AR 654-56.)  The ALJ expressly cited this record stating: "Notably, after she refused surgery through worker's compensation, the claimant's primary care provider noted there was not much else to offer her and she only wanted medical therapy . . . He also indicated her shoulder pain was only intermittent."  (AR 30, citing AR 654.)

1   examinations: (1) cervical strain; (2) impingement syndrome of right shoulder, with probable

2   tear of labrum; (3) possible coronoid fracture of the right elbow with tear of the medial ulnar

3   collateral ligament; (4) osteochondral lesion of the posterior capitellum, right elbow; and (5)

4   interstitial tear of the common extensor tendon.   (AR 445-46.)   Plaintiff requested a

5   corticosteroid injection, and once the injection was completed, Plaintiff would be "declared

6   permanent and stationary."  (AR 446.)  A follow-up was to be conducted in four weeks.  (Id.)

7   On March 2, 2015, Plaintiff was prescribed tramadol and was again referred for a corticosteroid

8   injection in the shoulder joint, and as part of the workers' compensation process Plaintiff's injury

9   was designated as permanent and stationary, with modified activity to include no reaching above

10  the shoulder (AR 443, 493).  This was Plaintiff's last examination with a workers' compensation

11  provider.

12       Given the content and history of the workers' compensation records reviewed and cited

13  by the ALJ, including the ALJ's express highlighting that these worker's compensation opinions'

14  restrictions had various exertional limitations ranging between ten and thirty pounds throughout

15  the relevant time period (AR 32-33), and the description and review of the records by the ALJ

16  beginning in March of 2015 when the Plaintiff began treatment with primary care providers

17  rather than the worker's compensation providers (AR 30), the Court finds that the ALJ's

18  discounting of the workers' compensation opinions, including Dr. Mochizuki's, because the

19  opinions' findings were temporary in nature with no stated duration of the activity was a specific

20  and legitimate reason for discounting the opinions, supported by substantial evidence.  The

21  ALJ's statement is facially true given the nature of workers' compensation opinions in general,

22  see Holloway, 2017 WL 5508512, at *5 (noting the "opinion that plaintiff is permanent and

23  stationary is only a finding that plaintiff's condition is not expected to improve [and] does not

24  show that plaintiff is more limited than assessed in the RFC"), and because of the details

25  surrounding the nature of the last visit with Dr. Mochizuki and the other workers' compensation

26  provider, including notations that Plaintiff was declining surgery, and that she would be managed

27  conservatively with no further medical treatment by Dr. Mochizuki.   Thus, this particular

28  permanent and stationary opinion was especially reflective of the fact that it only states

18

1  Plaintiff's condition had reached maximum medical improvement, or her condition had been

2  stationary for a reasonable period of time.  See Viramontes, 2010 WL 3212861, at *7.

3      Further even if this reason for assigning reduced weight would not stand in isolation, as

4  the Court finds herein, the ALJ's other reasons for assigning reduced weight to the worker's

5  compensation opinions, including Dr. Mochizuki's, were also specific and legitimate reasons

6  supported by substantial evidence, and bolster this reason when considered collectively; the

7  ALJ's assigning greater weight to the state agency physician opinions was proper; and the

8  ultimate RFC determination is supported by substantial evidence.  See Rounds v. Comm'r Soc.

9  Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) ("the ALJ is responsible for translating and

10  incorporating clinical findings into a succinct RFC."); Shaibi v. Berryhill, 883 F.3d 1102, 1108

11  (9th Cir. 2017) ("Where evidence is susceptible to more than one rational interpretation, it is the

12  ALJ's conclusion that must be upheld . . . As we cannot say that the ALJ's interpretation of the

13  available evidence was not rational, the ALJ's conclusions were supported by substantial

14  evidence.").

15          ii.      Intermittent Shoulder Pain

16      The Court now turns to the Plaintiff's argument that the ALJ improperly relied on the fact

17  that after Plaintiff stopped seeing the workers' compensation doctors, Plaintiff reported her

18  shoulder pain was intermittent.  Specifically, the ALJ stated: "records after the claimant stopped

19  seeing the worker's compensation providers indicate her shoulder pain was only intermittent [AR

20  654]." (AR 33.)

21      While the ALJ's statement reads "records" in the plural, the ALJ only cited to one record

22  in this specific part of the opinion.  This record reflects that on April 4, 2016, Dr. Yang noted

23  that Plaintiff's shoulder pain is intermittent, that "[s]he was recommended to have surgery and

24  she refused," that she continues to have shoulder pain, and that "there is not much more to offer[]

25  for she already completed shoulder work up and refused surgery . . . [s]he only wants medical

26  therapy."  (AR 654.)  Dr. Yang also recorded that Plaintiff was not taking her blood pressure

27  medication, and made a notation under "Diagnosis" of "Plaintiff's noncompliance with other

28  medical treatment and regimen."  (AR 654-56.)

While only citing one record, the ALJ's statement that "records after the claimant stopped seeing the worker's compensation providers indicate her shoulder pain was only intermittent," is an accurate statement.  Review of the administrative record reveals that on February 6, 2017, Dr. Yang noted intermittent right shoulder pain on physical exam.  (AR 636, 639.)  Other records also note descriptions of the shoulder pain as intermittent earlier in the treatment process.  Some records show Plaintiff's pain was described both as chronic and intermittent in the same examination.  Specifically, Plaintiff's last examination with Dr. Mochizuki was on February 2, 2015, and the last examination with any workers' compensation doctor was March 2, 2015.  (AR 443, 446, 493.)  Previously, on October 10, 2013, and November 7, 2013, pain was described as "chronic, mild, moderate, intermittent, sharp, stabbing and aching."  (AR 432, 435.)  On December 27, 2013, Plaintiff's described intermittent pain in the front of the shoulder.  (AR 429.)  On February 7, 2014, Plaintiff's shoulder pain was described as both intermittent and chronic.  (AR 426.)  On March 24, 2014, under history of illness, Plaintiff's pain is described as "chronic, mild, intermittent, sharp, and stabbing."  (AR 423.)  Treatment notes from May 12, 2014, June 23, 2014 and August 4, 2014, describe Plaintiff's history and states "pain is constant, no improvement," described as aching with intermittent sharp pain, and also notes the "pain improves with rest and medication and worsens with overuse."  (AR 400.)

Thus, the ALJ's finding that the records indicate that Plaintiff's shoulder pain was intermittent is supported by substantial evidence in the record.[12]  A rational interpretation of the ALJ's statement is that the ALJ was relying on the fact that intermittent pain is inconsistent with such exertional limitations, and not that the shoulder pain had improved a certain degree to only intermittent.  See Shaibi, 883 F.3d at 1108.  Additionally, in another portion of the ALJ's opinion, the ALJ cites to the same April 4, 2016 record, stating: "Notably, after she refused surgery through worker's compensation, the claimant's primary care provider noted there was not much else to offer her and she only wanted medical therapy . . . He also indicated her

---

[12]  Plaintiff did not present an argument that the ALJ's notation of this record was improper because of previous notations of intermittent pain were also in the record, but rather argues Plaintiff's shoulder pain never was indicated to have improved such a degree as to render Dr. Mochizuki's opinion irrelevant, and argues Plaintiff reported persistent shoulder pain.  (Br. 14.)

1   shoulder pain was only intermittent."  (AR 30.)  The ALJ provided a specific and legitimate

2   reason supported by substantial evidence in the record to reject the opinion of Dr. Mochizuki.

3       Further even if this reason for assigning reduced weight would not stand in isolation, as

4   the Court finds herein, the ALJ's other reasons for assigning reduced weight to the worker's

5   compensation opinions, including Dr. Mochizuki's, were also specific and legitimate reasons

6   supported by substantial evidence, and bolster this reason when considered collectively; the

7   ALJ's assigning greater weight to the state agency physician opinions was proper; and the

8   ultimate RFC determination is supported by substantial evidence.  See Rounds, 807 F.3d at 1006;

9   Shaibi v. Berryhill, 883 F.3d at 1108.

10      e.      The ALJ's Reliance on the Objective Imaging Results was not Error

11      The Court next turns to Plaintiff's argument that the ALJ is not a medical expert and

12  improperly interpreted the objective imaging results.  In response, Defendant first highlights the

13  following passage from the ALJ's opinion pertaining to the weighing of the objective imaging

14  results:

15          The objective evidence is not consistent with the severity and frequency of
            alleged symptoms related to the claimant's right upper extremity impairment.  X-
16          rays of the right shoulder revealed a slightly diminished subacromial space with a
            type II acromion [AR 476[13]].   The MRI of the shoulder from April 2014
17          demonstrated a degenerative signal in the superior labrum [AR 476, 489-90[14]].
            However, in 2015, X-rays showed a normal right shoulder and the abnormalities
18

19  [13]  Here the ALJ cites a record from the first visit with Dr. Mochizuki on June 2, 2014, wherein previous imaging
20  results were summarized as follows: "X-rays of the cervical spine include AP and lateral views, taken on August 14,
    2013.  The x-rays demonstrate straightening of the normal cervical lordosis.  X-rays of the right shoulder
21  demonstrate a slightly diminished subacromial space with a type II acromion.  X-rays of the right elbow demonstrate
    a calcification measuring 2mm adjacent to the coronoid.  It is unclear whether this represents an osteophyte or
    possible fracture."  (AR 475-76.)

22
    [14]  Here the ALJ again cites the record from the first visit with Dr. Mochizuki on June 2, 2014, wherein the previous
23  April 14, 2014 MRI was summarized as demonstrating "degenerative signal in the superior labrum,"  (AR 476.)
    The ALJ also cites the actual imaging findings which state the same in addition to adding "without evidence of
24  displaced tear," and noting an intact rotator cuff.  (AR 489-90.)  Specifically, the April 14, 2014 MRI findings
    showed: (1) the undersurface of the acromion is flat, mild degenerative changes of the acromioclavicular joint noted,
25  and humeral head well seated within the glenoid fossa; (2) focal subcortical cystic change seen at the distant
    attachment of the infraspinatus tendon, with remaining visualized osseous structures demonstrating normal cortical
26  and bone marrow signal intensity without evidence of fracture, trabecular bone injury dislocation, and no chondral
    defects identified; (3) supraspinatus, infraspinatus, teres minor and subscapularis tendons were intact; (4) rotator
27  cuff interval within normal limits; (5) long head of the biceps tendon normal in course and caliber and biceps labral
    anchor intact; (6) degenerative signal of lesion superior labrum noted without evidence of displaced tear, and no
28  labral tear identified; and (7) no significant muscle atrophy noted, and no significant joint effusion noted.  (AR 489.)

visualized on the previous MRI were not visualized [AR 613[15]].  Imaging of the right elbow in 2014 demonstrated a 2mm calcification adjacent to the cornoid [AR 476].  In June 2014, an MRI of the right elbow revealed an interstitial tear of the common extensor tendon and an osteochondral lesion of the posterior capitulum [AR 401, 488[16]].  Finally, it is noted that although the claimant complained of neck pain, the only abnormality on imaging was a straightening of the normal cervical lordosis [AR 476].

(AR 29.)   Defendant emphasizes the ALJ was citing to imaging reports from medical professionals that, for example, found pursuant to the May 26, 2015 x-ray of the right shoulder that Plaintiff had a normal right shoulder and that abnormalities visualized on the April 14, 2014 MRI of the shoulder were not seen (AR 613).  Thus, Defendant argues that the ALJ properly considered and weighed the opinion under the regulations, 20 C.F.R. §§ 404.1527(c)(3)-(4), and properly assessed whether it was consistent and supported by the objective medical evidence, basing her decision on substantial evidence in the record, including but not limited to the objective medical imaging.  (Opp'n 15.)

Defendant is correct that the impressions based on the May 26, 2015 x-ray results noted that there was a "[n]ormal right shoulder," and that the "[a]bnormalities visualized on MRI of shoulder of 4/14/2014 are not visualized."  (AR 613.)  The x-ray results also showed: (1) bony structures were intact and normally mineralized; (2) no fracture, erosive or destructive changes; (3) acromioclavicular and glenohumeral joints are normally maintained; (4) subacromial space preserved; and (5) no soft tissue abnormality.  (AR 613.)  Plaintiff responds that the x-ray report does not state that the defects observed upon an earlier MRI were resolved, but rather only identified that no bony abnormalities were present and the soft tissue defects were not visualized.  Plaintiff argues that x-rays only produce imaging of dense tissues and would not show damage to Plaintiff's cartilage and ligaments that would be shown on an MRI.  (Reply 4-5.)

It may be true that x-rays are "less effective at viewing soft tissues" than an MRI.  <u>Larson</u>

---

[15]   The May 26, 2015 x-ray impressions noted that there was a "[n]ormal right shoulder," and that the "[a]bnormalities visualized on MRI of shoulder of 4/14/2014 are not visualized."  (AR 613.)

[16]   The June 16, 2014 MRI found: (1) small osteochondral lesion of the posterior capitulum at the radiohumeral joint with no other significant areas of abnormal signal; (2) ulnohumeral and radiosigmoid spaces grossly preserved; (3) ulner collateral ligament and annular ligament intact; (4) tendons of the medial, lateral, anterior, and posterior compartments intact; (5) no significant bursal or soft tissue abnormality; (6) severe tendinosis/interstitial tear of the common extensor tendon; and (7) no effusion.  (AR 401; 488.)  The impressions were: (1) osteochondral lesion of the posterior capitulum; and (2) interstitial tear of the common extensor tendon.  (<u>Id.</u>)

v. Berryhill, No. 2:17-CV-00029-DWC, 2017 WL 2620068, at *4 (W.D. Wash. June 16, 2017) (citing *Chondromalacia patella*, Diagnosis, Mayo Clinic, http://www.mayoclinic.com/health/chondromalacia-patella/DS00777); see also Hall v. Colvin, 778 F.3d 688, 690-91 (7th Cir. 2015) (noting that "for such soft-tissue injuries an MRI is a better diagnostic tool than an x-ray.") (citing National Library of Medicine, *Medline Plus,* "Lumbosacral Spine X–Ray," www.nlm.nih.gov/medlineplus/ency/article/003807.htm.). However, Plaintiff's statement that x-rays *only* produce imaging of dense tissues and would not show damage to Plaintiff's cartilage and ligaments as shown on an MRI, appears to overstep in the definitiveness of the assertion.  See National Library of Medicine, *MedlinePlus,* "X–Ray," available at https://medlineplus.gov/ency/article/003337.htm (last accessed May 15, 2020) ("Structures that are dense (such as bone) will block most of the x-ray particles, and will appear white . . . Structures containing air will be black, and muscle, fat, and fluid will appear as shades of gray."); National Library of Medicine, *MedlinePlus,* "Joint x–Ray," available at https://medlineplus.gov/ency/article/003810.htm (last accessed May 15, 2020) (noting joint x-rays may be conducted on shoulders and other joints and may show degenerative conditions of the joint such as arthritis); National Library of Medicine, *MedlinePlus,* "Arthritis," available at https://medlineplus.gov/ency/article/001243.htm (last accessed May 15, 2020) (noting arthritis is "inflammation or degeneration of one or more joints . . . and involves the breakdown of cartilage."); see also National Library of Medicine, *MedlinePlus,* "Abdominal x–Ray," available at https://medlineplus.gov/ency/article/003815.htm (last accessed May 15, 2020) (noting abdominal x-rays are used to look at organs and structures in the abdomen, and is used to diagnose issues such as kidney stones, blockages in the intestine, or to diagnose tumors, abdominal masses, or other injuries to the abdominal tissue.).

In fact, x-rays are routinely cited, in conjunction with MRI results or separately, in social security cases as evidence of the presence or absence of soft-tissue abnormalities.  See, e.g., Paxton v. Saul, No. 1:18-CV-00716-BAM, 2020 WL 639199, at *6 (E.D. Cal. Feb. 11, 2020) ("Nevertheless, x-rays of Plaintiff's right ankle in August 2015 showed mild soft tissue prominence, a mortise joint that was congruent and no acute osseous abnormalities . . . while x-

rays of Plaintiff's right ankle in December 2016 showed only mild soft tissue swelling . . . [and] x-rays of his right wrist in December 2016 were negative and showed no significant osseous, articular, or soft tissue abnormality."); Gardner v. Berryhill, No. 6:16-CV-01105-YY, 2017 WL 7163956, at *4, 7 (D. Or. Nov. 29, 2017) ("Multiple x-rays taken of the right shoulder showed a 'normal right shoulder' and 'no significant abnormalities' of the soft tissue or bones . . . the ALJ noted that both of Gardner's lumbar x-rays showed normal disc spacing without deformity, normal joints and soft tissues . . . ALJ also noted that the July 2013 x-ray of Gardner's right shoulder showed normal findings and no abnormalities of the bones or soft tissue . . . Accordingly, the ALJ did not err in finding that the severity of Gardner's symptom testimony was contradicted by the unremarkable results contained in the imaging reports."); Arellano v. Colvin, No. CV 11-769-TUC-CRP, 2013 WL 5448418, at *3 (D. Ariz. Sept. 30, 2013) ("August 2006 x-rays showed mild osseous proliferation at the fascial insertion, mild increase in soft tissue volume, and density at affected areas."); Powell v. Astrue, No. CV 10-923-TC, 2011 WL 7024967, at *7 (D. Or. Sept. 23, 2011) ("The MRI revealed a horizontal memscus tear, cartilage thinning, mild to moderate joint disease, and moderate joint effusion . . . One month later, an x-ray revealed soft tissue swelling, moderately extensive degenerative changes, and no evidence of joint effusion."); Shari R. v. Comm'r of Soc. Sec., No. 2:17-CV-00284-SMJ, 2018 WL 3244086, at *6 (E.D. Wash. July 3, 2018) ("X-rays and MRI's showed normal soft tissue and articular structures and an absence of joint space narrowing or avascular necrosis."); Scheitlin v. Colvin, No. CV 12-1799-E, 2013 WL 3878961, at *3 (C.D. Cal. July 26, 2013) ("X-rays of Plaintiff's feet and ankles showed bilateral soft tissue swelling and a large left plantar calcaneal spur.").

However, it is also true an ALJ may err by improperly ignoring MRI results or improperly relying on x-ray results when weighing all of the medical evidence in the record.  See Larson v. Berryhill, No. 2:17-CV-00029-DWC, 2017 WL 2620068, at *4, n.6 (W.D. Wash. June 16, 2017) ("The ALJ notes the X-ray examination report in the record was essentially normal; however, Dr. Smith did not rely on X-rays.  Instead, the ALJ fails to mention that Dr. Smith relied on MRI scans which were consistent with chronic medial retinacular sprain and chondromalacia . . . As Dr. Smith relied on imaging techniques better suited to assessing damage

1 to soft tissues, the ALJ's use of X-ray scans to discount Dr. Smith's opinion does not constitute a

2 specific and legitimate reason supported by substantial evidence."); Hall v. Colvin, 778 F.3d 688,

3 690-91 (7th Cir. 2015) (noting that "for such soft-tissue injuries an MRI is a better diagnostic

4 tool than an x-ray" and holding the "administrative law judge's most serious error, one we've

5 noted in previous cases . . . is her belief that complaints of pain, to be credible, must be

6 confirmed by diagnostic tests.  Even if that were true, she should have known of the limitations

7 of x-rays as tools for diagnosing pain and, knowing that, should have ordered an MRI before

8 issuing her decision, because his two earlier MRIs had, he testified, preceded the onset of his

9 total disability.") (citing National Library of Medicine, *Medline Plus,* "Lumbosacral Spine X–

10 Ray," www.nlm.nih.gov/medlineplus/ency/article/003807.htm.).

11       Turning to the evidence presented here, given the totality of records and analysis

12 completed by the ALJ, the Court declines to find the ALJ erred.  Assuming, *arguendo*, the x-ray

13 impressions were the sole reason given by the ALJ for discounting Dr. Mochizuki's opined

14 limitations, perhaps a stronger case that the ALJ erred could be constructed.  However, even

15 taken in isolation, the Court cannot find it unreasonable nor improper how the ALJ summarized

16 and noted her review of the entirety of the objective imaging medical evidence, including the

17 specific notation of the x-ray results in question not showing the abnormalities shown on the

18 previous MRI (AR 29), then cited these same imaging records in the portion of the opinion

19 reviewing all of the worker's compensation opinions finding the degree of changes shown on the

20 imaging of the shoulder or elbow did not support a reduction in functional limitations to 10

21 pounds, when the various worker's compensation opinions over the period in question contained

22 restrictions ranging from 10 pounds to 30 pounds.  (AR 32-33.)

23       Given the range of opined limitations by the worker's compensation providers, the Court

24 finds the ALJ reasonably found a reduction of exertional limitations to only ten pounds was not

25 consistent with the degree of changes shown on imaging of the shoulder or elbow, and thus

26 found such limitation to be primarily based on subjective complaints of pain, and not supported

27 by such imaging results.  (AR 32-33.)  Facially and taken alone, this appears to be a specific and

28 legitimate reason for assigning reduced weight to the various worker's compensation opinions,

1   including Dr. Mochizuki's, and is supported by substantial evidence in the record, as the Court's

2   review and description of such evidence above shows.   While Plaintiff is correct the x-ray

3   impressions do not expressly state that any or all problems with Plaintiff's right extremity *have*

4   been resolved, the impressions also do not state that the abnormalities that are visible through an

5   MRI could not be seen with an x-ray.   Rather, the record clearly and simply states the

6   abnormalities previously shown on MRIs were not present on the x-ray.  (AR 613.)  It was not

7   unreasonable nor legal error for the ALJ to specifically rely on such diagnostic impressions

8   expressly stated on the x-ray report when weighing all of the medical evidence.  Further, to be

9   clear, in the ALJ's portion of the opinion discounting the various worker's compensation doctor

10   opinions that included Dr. Mochizuki's (AR 33), the ALJ did not explicitly nor only cite to the

11   fact that the later x-ray results did not show the abnormalities visualized on the previous MRI,

12   but only stated the degree of changes shown across the various imaging results did not support

13   the more extreme reductions across the spectrum of the worker's compensation modified work

14   slips.  (AR 32-33.)

15         Additionally, the Court finds the ALJ did not ignore the results of the MRIs in favor of

16   the x-rays, but rather weighed the impressions taken through a variety of dates in conjunction

17   with the various medical opinions, finding the evidence did not support the opined limitations.

18   (AR 29, 33; see also, the Court's review of the records cited by the ALJ, supra, footnotes 4, 5, 6,

19   7, 8, 9.)  When considered as a part of the ALJ's overall review and analysis of the record as a

20   whole, including Plaintiff's refusal of surgery, testimony of travel and stated activities of

21   Plaintiff highlighted by the ALJ (AR 30), the review of the doctors' opinions, both state and non-

22   state,[17] the ALJ's review and statements concerning the objective imaging results made when

---

23   [17]  The ALJ assigned great weight to the State agency physicians Frankel and Bugg, who found Plaintiff could

24   perform medium work except frequent pushing and pulling with the upper right extremity and frequent overhead
     reaching with the upper right extremity, stating that "[a]lthough the State agency consultants did not have the

25   opportunity to review later rec[e]ived medical evidence, there has been little change in the claimant's status as her
     treatment remained routine and conservative with medication prescribed by her primary care provider."  (AR 33.)

26   Dr. Frankel rendered the opinion on July 24, 2015, and appears to have reviewed medical evidence dating up to June
     18, 2015.  (AR 99-106.)  Dr. Bugg rendered an opinion on October 28, 2015, and appears to have reviewed medical

27   evidence dating up to September of 2015.  (AR 135-40.)   The Court's review has confirmed the records do not
     reflect any significant detrimental changes that stand out from prior dates.  Plaintiff does not specifically argue that

28   Dr. Frankel or Bugg did not have access to records that reflect significant changes or that would have materially
     affected their ultimate findings, nor did Plaintiff specifically address the assessments.  The Court finds the ALJ

weighing the workers' compensation opinions including Dr. Mochizuki's, were specific and legitimate reasons for discounting the opinion, and were supported by substantial evidence in the record, and not erroneous.  Rounds, 807 F.3d at 1006; Shaibi, 883 F.3d at 1108.

Accordingly, for all of the above reasons, the ALJ did not err in assigning reduced weight to Dr. Mochizuki's opinion.

### 2.   The ALJ's Weighing of Dr. Popper's Opinion was not Erroneous

On August 22, 2017, Dr. Popper completed a mental disorder questionnaire form.  (AR 681-85.)  Plaintiff argues the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Popper's opinion.

In assigning reduced weight to Dr. Popper's findings contained in the mental health questionnaire, the ALJ stated the following:

> Dis[co]unted weight is given to the statement by Mark Popper, Ph.D., who indicated the claimant had difficulty keeping her appointments even with reminders; she was disoriented to time and her memory, concentration, and judgment were poor; her ability to interact with and communicate effectively with others was poor; her ability to sustain focused attention, complete every day household routines, and follow instructions was poor; and she had a poor ability to adapt to stress and a low frustration tolerance [AR 681-85].  While this statement was given considerable weight as to establishing the presence of severe mental impairments with associated functional limitations, it reflects observations of the claimant's emotional state rather than findings that would support more limitations than stated in the residual functional capacity.  The claimant's tearful and depressed mood displayed during her therapy sessions has been accounted for with the reduction to no contact with the public.  However, the report of the consultative examiner does not support the claimant's poor attention or focus because the claimant demonstrated the ability to comprehend instructions without difficulty during testing, even though she put forth poor effort on testing [AR 679[18]].  Additionally, the claimant's primary care provider, who prescribed her

properly relied on the opinions of state agency physicians Frankel and Bugg.  Given the consistency with other evidence identified by the ALJ, their opinions are also substantial evidence supporting the ALJ's evaluation of all of the medical evidence of record.  See Tonapetyan, 242 F.3d at 1149 ("Although the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record."); Sportsman v. Colvin, 637 F. App'x 992, 994–95 (9th Cir. 2016) ("The ALJ th[o]roughly summarized the facts and conflicting evidence regarding Sportsman['s] physical limitations, including an extensive review of the medical opinions of Sportsman's treating physicians, stated his interpretation of the facts and conflicting evidence, and made findings accordingly . . . We find that the ALJ did not err in assigning substantial weight to the state agency medical consultant, whose opinion relied on and was consistent with the medical evidence of record.") (citing Tonapetyan, 242 F.3d at 1149).

[18]  Here the ALJ cites a July 27, 2017 psychological evaluation completed by Dr. James Murphy.  (AR 676-80.)  The relevant portion of the report states that: "The claimant appeared to comprehend the instructions with out [sic] difficulty from the beginning of the first test series and her sample answers revealed that she understood what was

medication for depression, noted the claimant was cognitively at her baseline with no deficit [AR 576[19]].  Additionally, the reported poor response to stress is not consistent with the claimant's ability to manage many situational stressor[s] with only a low dose of medication and no evidence of decompensation [AR 550, 553, 563, 622, 688, 695, 716].  The reduction to simple tasks with few changes in the work setting and no contact with the general public limits the stress and distractions in the claimant's environment and will allow her to perform basic work activities on a regular and continuing basis.

(AR 34.)  The ALJ also gave little weight to the global assessment of functioning ("GAF") scores, including the GAF score of 43 issued by Dr. Popper:

Little weight is given to the global assessment of functioning (GAF) scores of 43 [AR 732] and 55 [AR 563, 618].  These scores represent serious to moderate symptoms.  They were given by two different mental health providers, around the same period of time, demonstrating the inconsistent nature of GAF scores and their ability to fluctuate widely.  Furthermore, GAF scores consider more than just the claimant's occupational functioning and the basis for the scores and weight given to specific factors was not provided.  However, it is noted that a finding of moderate symptoms is not inconsistent with the residual functional capacity above.

(AR 34.)

Preliminarily, Defendant first emphasizes that while Plaintiff states the ALJ "rejected" Dr. Popper's opinion, the ALJ did not completely reject the opinion but instead gave it discounted weight, giving considerable weight to the opinion to the extent it established Plaintiff

---

expected of her and attempted to perform on these problems to the best of her ability, however, once she began the actual test she appeared to give little thought to the answers and answered indiscriminately.  The claimant scored in the Very Poor Range at the <1st percentile on her overall full scale.  This indicates that greater than 99 percent of the population would score higher than she did.  This is considered an un-acceptable Level of Intelligence.  **Ms. Yang seemed to make very little effort to answer the problems correctly.**  Her ability to complete the sample problems correctly suggests she understood the tests.  She seemed to have no difficulty grasping the idea behind the actual test scales.  (AR 679, emphasis in original.)  The report went on to state: "Her level of intelligence as recorded through the interview and testing could not be assessed due to her poor effort on testing.  She was able to sit for two hours without a break and did not verbally or behaviorally demonstrate discomfort.  Ms. Yang'[s] ADL's, work history, and education history suggest that she functions at a higher level than the test results indicate.  It appeared that the most difficult barriers for this individual to overcome if she were to attempt to re-enter the work force would be her desire not to work.  **This individual's test results indicates she is incapable of performing Simple Repetitive Tasks (SRT) but there is some question as to how much effort she put into the tests.**"  (AR 679, emphasis in original.)  In the portion relating to the Wechsler Memory Scale test, the report states: **INTERPRETATION OF THESE TEST RESULTS SHOULD BE DONE WITH EXTREME CAUTION DUE TO POOR EFFORT OF THE CLAIMANT.**"  (AR 678, emphasis in original.)  Dr. Murphy also stated: "She did understand simple, basic instructions, and was able to complete sample tasks assigned to her by this clinician without any difficulty but once she was started on the actual test material she demonstrated no effort."  (AR 680.)

[19]  On May 4, 2015, Plaintiff visited Dr. Bobby Yang as a new patient complaining of heat intolerance, insomnia and dry eyes.  (AR 574.)  The record notes Plaintiff's functional status was within normal limits and "cognitively at baseline with no deficit, good speech, good muscle control, good mood, [and] can converse and respond appropriately."  (AR 576.)

had severe mental impairments and associated functional limitations.  (Opp'n 16, AR 34, 681-87.)  For example, the ALJ specifically accounted for Plaintiff's tearful and depressed mood displayed during therapy sessions with Dr. Popper, with a reduction in the RFC to no contact with the public (AR 28, 34).  (Opp'n 16.)  The Court finds this is an accurate characterization of the ALJ's manner of assigning reduced weight to certain aspects of the opinion, as the Court summarized above.

Turning to the specific arguments, Plaintiff first emphasizes the following of Dr. Popper's findings: (1) Plaintiff had difficulty keeping up with appointments and reminders; (2) Plaintiff was sad, depressed, worried, anxious, and cried during all therapy sessions; (3) Plaintiff was disoriented to time with poor recent and long-term memory, and poor concentration and impaired judgment; (4) Plaintiff's capacity to interact appropriately and communicate effectively with others was poor; (5) Plaintiff cries in public and around people in waiting rooms, cries to strangers about her problems, is easily tearful, and has poor interpersonal skills; (6) Plaintiff's ability to sustain focused attention, complete everyday household routines, and follow instructions is poor, and she is extremely overwhelmed, preoccupied, and often loses focus; (7) Plaintiff has poor ability to adapt to stress, has low frustration tolerance, is easily overwhelmed and discouraged, has a short attention span, and poor decision-making skills; (8) Plaintiff's prognosis was poor and her condition was chronic; and (9) Plaintiff was not competent to manage funds on her own behalf.  (Br. 10-11; AR 681-85.)  Plaintiff was diagnosed with (1) major depressive disorder, recurrent episode with psychotic features; (2) generalized anxiety disorder; and (3) posttraumatic stress disorder, chronic.  (AR 685.)

Plaintiff contends the ALJ's statement that Dr. Popper's opinion "reflects observations of the claimant's emotional state rather than findings that would support more limitations than stated in the residual functional capacity," (AR 34), is premised on the unsupported assumption that an emotional state "due to pervasive depression, is not relevant" to the RFC.  (Br. 15.)  Plaintiff argues the ALJ's opinion that a limitation on public contact adequately accommodates Plaintiff's persistent depression and crying throughout therapy sessions (AR 33-34), is not supported by the record and is contradicted by Dr. Popper's conclusion that Plaintiff's pervasive

1   depression interferes with her ability to effectively communicate and relate to others, sustain a

2   routine, tolerate stress, and concentrate or complete tasks.  (Br. 15-16.)  Plaintiff further argues

3   the ALJ improperly utilized several isolated examples of evidence to contradict Dr. Popper's

4   opinion, specifically, the ALJ's citation to the consultative examiner's notation of poor effort on

5   testing failed to set forth any specific and legitimate reasons for crediting the examiner's opinion

6   rather than Dr. Popper's assessment, and what the consultative examiner identified as "poor

7   effort" is in fact shown in the record to be symptoms of amotivation, poor concentration, and a

8   genuine lack of understanding, as for example, Plaintiff could not identify her age or son's age at

9   the hearing because she never attended school and did not know simple math (AR 53-55), and

10  she routinely displayed lack of eye contact, persistent mental preoccupation and distraction,

11  isolation, lack of interest in activities with trouble completing tasks, lack of desire for anything,

12  and poor grooming (AR 705, 725-32).  (Br. 16.)

13      Defendant responds the ALJ properly found Dr. Popper's opinion simply reflected

14  observations of Plaintiff's emotional state and that such findings were not entirely consistent

15  with or supported by the record, and would not support more limitations than already assessed in

16  the RFC.  (Opp'n 16.)  In reviewing Dr. Popper's opinion that Plaintiff had poor attention or

17  focus, the ALJ found it inconsistent with Plaintiff's demonstrated ability during testing with

18  consultative examiner Dr. Murphy who noted that even though she displayed poor effort,

19  Plaintiff's behavior was goal-directed and showed an ability to comprehend instructions without

20  difficulty (AR 34, 673-80, 684-85).  (Opp'n 16.)  The ALJ gave considerable weight to Dr.

21  Murphy's determination that Plaintiff did understand simple, basic instructions and was able to

22  complete without difficulty the assigned simple tasks (AR 34, 679).  The ALJ found Plaintiff's

23  ability to understand the instructions and tasks at the psychological examination as consistent

24  with the ability to perform simple, routine tasks (AR 28, 34, 679).  (Opp'n 16-17.)

25      Plaintiff replies that identifying a conflicting opinion is not itself an explanation for

26  crediting that opinion over the other, and the ALJ's discounting Dr. Popper's findings because

27  the "report of the consultative examiner does not support the claimant's poor attention or focus"

28  (AR 34), was improper because Dr. Popper's treatment records do not support the consultative

examiner's findings that Plaintiff has the ability to complete tasks without any difficulty, and the existence of a conflict alone does not constitute an explanation for discounting Dr. Popper's opinion.  (Reply 3 (citing Garrison v. Colvin, 759 F.3d 995, 1012–13 (9th Cir. 2014) ("An ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion")).)

As another preliminary consideration, the Court notes the ALJ did not accept the entirety of Dr. Murphy's opinion, but gave greater weight to certain aspects of the opinion, while assigning less weight to the aspects the ALJ found were not supported by other evidence in the record, including Dr. Murphy's finding that Plaintiff could not handle her own monetary funds:

> Considerable weight is given to the opinion of the consultative examiner, James Murphy Ph.D., who found the claimant did understand simple, basic instructions, and was able to complete sample tasks assigned to her without any difficulty, but once she was started on the actual test material, she demonstrated no effort; the most difficult barriers for her to overcome if she were to attempt to re-enter the workforce would be her desire not to work; she could not handle her own funds; and she had a GAF score of 60 (Exhibit B10F at 10-11).  Considerable weight is given as, although Dr. Murphy indicated poor effort during testing with an inability to assess her level of functioning due to poor effort, her behavior was in a goal-directed fashion and she understood the instructions of the tasks consistent with the ability to perform simple routine tasks.  It is also noted that the claimant requested this consultative examination herself and not cooperating with the process demonstrates some strategic mental ability.  Little weight is given to Dr. Murphy's opinion the claimant could not handle her funds as she worked for many years, stopping for a physical injury and managed the household with her son and husband who were in poor health (Exhibit B11F).

(AR 33-34.)[20]

Turning to Plaintiff's argument that the ALJ only utilized a conflicting opinion to discount Dr. Popper's opinion without further support, the Court disagrees.  The ALJ did not simply reject Dr. Popper's opinion because it conflicted with Dr. Murphy's but rather cited the evidence contained in Dr. Murphy's report pertaining to Plaintiff's apparent poor effort on

---

[20] Like Dr. Popper, Dr. Murphy determined that Plaintiff could not handle her own monetary funds, and the ALJ assigned reduced weight to this aspect of the opinion noting that Plaintiff stopped working due to a physical injury not a mental condition and worked for many years and managed a household with her son and husband being in extremely poor health.  (AR 34, 675, 685.)  Plaintiff does not specifically challenge the ALJ's assignment of reduced weight to this aspect of Dr. Murphy's opinion.

testing, as well as her ability to understand the testing instructions and other observations made during the consultative exam with Dr. Murphy.  Specifically, as to the ALJ's notation of poor effort demonstrated in testing, an ALJ's citation to poor effort in testing can constitute a specific and legitimate reason for rejecting a medical opinion.  See Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ gave "specific, legitimate reasons for discrediting particular opinions" and determining credibility of medical evidence, where "[i]n discrediting the report, the ALJ reasoned that a one-hour physical capacity evaluation relies almost entirely on subjective information, and when a claimant exaggerates symptoms, the results cannot be valid."); Brady v. Berryhill, No. EDCV 17-1075 JC, 2018 WL 2090508, at *4 (C.D. Cal. Apr. 27, 2018) (ALJ gave specific and legitimate reasons for giving partial weight to two opinions where one doctor "expressly noted that the psychological testing scores appeared to be 'invalid' which was 'consistent with [plaintiff's] impaired mental status' (i.e., during the evaluation plaintiff 'seem[ed] to be intoxicated from either alcohol or other street drugs') and plaintiff's 'poor effort.' ") (alterations in original); Murphy v. Colvin, No. 2:13-CV-1760 AC, 2014 WL 3837026, at *14 (E.D. Cal. July 30, 2014) (Upholding ALJ's rejection of opinion based in part on findings of poor effort and possible malingering during psychological testing); Ybarra v. Saul, No. 1:18-CV-00924-BAM, 2019 WL 4734759, at *8 (E.D. Cal. Sept. 27, 2019) (rejecting opinion in part due to poor effort on range of motion testing); Bullene v. Astrue, No. C12-808MJP-MAT, 2013 WL 228642, at *3 (W.D. Wash. Jan. 22, 2013) (noting the "Ninth Circuit held that an ALJ may reject the opinion of an examiner when the claimant puts forth poor effort during examinations.").

However, it is not clear to what extent an ALJ may properly use poor effort in testing noted in one medical examiner's report to assign reduced weight to another medical examiner's report.  See Corral v. Colvin, No. 2:13-CV-3056-FVS, 2014 WL 3411233, at *7 (E.D. Wash. July 10, 2014) (finding "poor effort at testing conducted by Dr. Thompson, Dr. Muscatel, Dr. Drew and Dr. Duvall has little to do with the reliability of Dr. Brown's findings," as the "ALJ pointed to nothing in Dr. Brown's records suggesting a lack of effort or malingering while Dr. Brown treated and evaluated plaintiff," and Dr. Brown's conclusions were similar to those of Dr.

1    Thompson, Dr. Muscatel and Dr. Brown, while the true "inconsistent findings [were] those of

2    Dr. Duvall, who found no limitations," and therefore the ALJ's determination that Dr. Brown's

3    findings were inconsistent with objective evidence that plaintiff gave poor effort was not based

4    on substantial evidence, and the "conclusion that the neuropsychological evaluations 'raised

5    questions about his effort and the extent of his symptoms' is an overstatement of the evidence

6    [as] [o]nly Dr. Duvall raised questions about plaintiff's effort during neuropsychological

7    evaluations and his objective test results reflect that lack of effort."); <u>Baez v. Colvin</u>, No. ED CV

8    15-881 MRW, 2016 WL 335633, at *3 (C.D. Cal. Jan. 26, 2016) ("Dr. Glassmire"s supposition

9    that Plaintiff put forth 'poor effort' on the IQ test is entirely unsupported in the administrative

10   record.  Most notably, Dr. Larson – the psychologist whom the agency hired to give Plaintiff the

11   test – *didn't observe any malingering or feigning* during the exam.  Dr. Larson noted that

12   Plaintiff had 'limited interest in completing' this specific test . . . [h]owever, there's no basis to

13   stretch this discrete note regarding one exam (measuring visual-motor functioning) to entirely

14   vacate the results of another one (measuring general intelligence).") (emphasis in original); <u>but</u>

15   <u>see</u> <u>Bullene</u>, 2013 WL 228642, at *3 ("Plaintiff's poor effort during both Dr. Lind's and Dr.

16   Thorpe's examinations constitutes a specific and legitimate reason for rejecting Dr. Thorpe's

17   opinion, even if Dr. Thorpe believed her own examination results were sufficiently valid to offer

18   an opinion").

19          While the Court reproduced portions of the report in greater detail above, <u>supra</u> footnote

20   17, here the Court reemphasizes significant observations by Dr. Murphy.  Dr. Murphy observed

21   that Plaintiff "appeared to comprehend the instructions without [sic] difficulty from the

22   beginning of the first test series and her sample answers revealed that she understood what was

23   expected of her and attempted to perform on these problems to the best of her ability, however,

24   once she began the actual test she appeared to give little thought to the answers and answered

25   indiscriminately."  (AR 679.)  Dr. Murphy noted: "**Ms. Yang seemed to make very little effort**

26   **to answer the problems correctly.**  Her ability to complete the sample problems correctly

27   suggests she understood the tests.  She seemed to have no difficulty grasping the idea behind the

28   actual test scales."  (AR 679, emphasis in original.)  Dr. Murphy noted Plaintiff's level of

intelligence "could not be assessed due to her poor effort on testing." (Id.)  Dr. Murphy observed that Plaintiff "was able to sit for two hours without a break and did not verbally or behaviorally demonstrate discomfort . . . [and her] ADL's, work history, and education history suggest that she functions at a higher level than the test results indicate." (Id.)  Dr. Murphy opined that "[i]t appeared that the most difficult barriers for this individual to overcome if she were to attempt to re-enter the work force would be her desire not to work." (Id.)

Further, Dr. Murphy stated Plaintiff's "**test results indicates she is incapable of performing Simple Repetitive Tasks (SRT) but there is some question as to how much effort she put into the tests.**" (AR 679, emphasis in original.)  Finally, in the portion relating to the Wechsler Memory Scale test, the report states: **INTERPRETATION OF THESE TEST RESULTS SHOULD BE DONE WITH EXTREME CAUTION DUE TO POOR EFFORT OF THE CLAIMANT.**" (AR 678, emphasis in original.)

Given the way Dr. Murphy repeatedly stated these admonitions with capital letters, bolding, and underlying, it appears the way Plaintiff demonstrated poor effort in testing was not simply an observation of certain aspects of her actions that *might indicate* poor effort, but rather were blatant and obvious to the consultative examiner.  This would clearly be a specific and legitimate reason supported by substantial evidence, for discounting the weight given to Dr. Murphy's opinion if the opined limitations were based on test results that Dr. Murphy himself stated were not reliable.  As noted above however, when used to discount the weight given to a different doctor that did not specifically opine Plaintiff had poor effort on testing or rely on the same testing in formulating the opinion, it is not clear to be proper in all circumstances.  However, the description of the poor effort put forth here and relevance to the ALJ's use of such report is distinguishable from the facts in Corral, 2014 WL 3411233, at *7, and Baez, 2016 WL 335633, at *3.  Further, the ALJ did not simply cite to poor effort in testing, but stated the "report of the consultative examiner does not support the claimant's poor attention or focus because the claimant demonstrated the ability to comprehend instructions without difficulty during testing," and then qualified that statement with "even though she put forth poor effort on testing." (AR 34.)  Thus, the ALJ was not only relying on the poor effort demonstrated, but the

observations of Dr. Murphy as to Plaintiff's ability to remain attentive and focus on tasks as demonstrated in the ability to complete the sample problems without any issues, and demeanor observed over a period of two hours.  The Court finds the ALJ's citation to the abilities exhibited during practice testing and poor effort during other testing observed by Dr. Murphy was a specific and legitimate reason supported by substantial evidence for assigning reduced weight to Dr. Popper's opinion.

Even if it were improper to solely rely on the poor effort and abilities demonstrated during testing with Dr. Murphy to discount Dr. Popper's opinion, the ALJ provided other reasons in the same portion of the opinion.  The Court turns to Plaintiff's challenges to these reasons as well.

Plaintiff argues the ALJ's citation to Plaintiff's prescribing physician and primary care provider "noted the claimant was cognitively at her baseline with no deficit" (AR 34), however, the treatment records cited to by the ALJ do not include mental status examination findings (AR 34, citing AR 576), as there is no notation for mental status examination, and Dr. Yang noted "she will need further evaluation with mental health" (AR 574-76), which indicates that Dr. Yang was not personally evaluating or assessing Plaintiff's mental health functioning.  (Br. 17.) Thus, Plaintiff argues Dr. Yang's general note about Plaintiff's overall status is not a specific and legitimate reason for rejecting Dr. Popper's detailed analysis of Plaintiff's specific mental health impairments.  (Br. 17.)

Specifically, following the ALJ's discussion of poor effort demonstrated with Dr. Murphy, the ALJ stated: "Additionally, the claimant's primary care provider, who prescribed her medication for depression, noted the claimant was cognitively at her baseline with no deficit." (AR 34.)  The Court has reviewed the record cited by the ALJ here.  (AR 34.)  On May 4, 2015, Plaintiff visited Dr. Bobby Yang as a new patient complaining of heat intolerance, insomnia, depression, and dry eyes.  (AR 574.)  The record notes Plaintiff was pleasant, her functional status was within normal limits, and she was "cognitively at baseline with no deficit, good speech, good muscle control, good mood, [and she could] converse and respond appropriately." (AR 576.)  Plaintiff accurately points out that the record also states: "She will need further

1  evaluation with mental health and hard copy of referral given to patient." (AR 574.)

2  Perhaps if taken in isolation, Plaintiff would have a stronger argument that a lone citation

3  to this record does not amount to a specific and legitimate reason supported by substantial

4  evidence for discounting Dr. Popper's opinion, however, as part of the multiple reasons offered

5  by the ALJ, the Court cannot find this was error to rely on these exam physician notes as one of

6  multiple reasons. The ALJ did not incorrectly reference this record, and the citation was offered

7  as part of multiple reasons, against the backdrop of conflicting opinion offered by the

8  consultative examiner Dr. Murphy, and reviewing state agency physicians. The Court finds this

9  was a specific and legitimate reason supported by substantial evidence for discounting the

10  opinion of Dr. Popper.

11  Additionally, Plaintiff argues that the ALJ's conclusion that Dr. Popper's opinion that

12  poor response to stress "is not consistent with the claimant's ability to manage many situational

13  stressor[s] with only a low dose of medication and no evidence of decompensation," (AR 34),

14  neglects to acknowledge that Plaintiff was not in fact managing her situational stressors, which is

15  why Plaintiff presented tearfully in weekly therapy session which she attended due to her

16  inability to cope, and as explained by Dr. Popper, Plaintiff often missed therapy appointments,

17  and explained to her providers that her absence was due to overwhelming stress (AR 622, 623-

18  26, 681). (Br. 17.) Defendant argues the ALJ properly found that Dr. Popper's opinion

19  reporting Plaintiff's poor response to stress was not consistent with the record, which displayed

20  Plaintiff's ability to manage many situational stressors with only a low dose of medication and

21  no evidence of decompensation (AR 34, 550, 553, 563, 598, 622, 688, 695, 716). (Opp'n 17.)

22  Specifically, as an additional reason given for discounting Dr. Popper's opinion, the ALJ

23  stated: "Additionally, the reported poor response to stress is not consistent with the claimant's

24  ability to manage many situational stressor[s] with only a low dose of medication and no

25  evidence of decompensation." (AR 34.) The Court has reviewed these records cited by the ALJ

26  here. They are essentially counseling records showing the various stress incidents that Plaintiff

27  complained about during treatment. For example, on June 8, 2015, therapy treatment notes

28  documented Plaintiff's stresses with an uncle passing away, hospitalization of her husband for

three days, her husband's "betrayal," PTSD from seeing her husband fall from panic, with progress notes only stating Plaintiff "is having trouble focusing and listening." (AR 550.) The record also notes Plaintiff came in "stating she forgot her appointment so she would just walk[] in when she remember[s]" (Id.) Another record for example, dated May 13, 2015, showed Plaintiff complained of stress from leaving her mother's house after a trip to Oregon, that she did not want to return home because she feels depressed there, that her son is hardly home, that she started crying when talking about her marriage, and shared sadness about one of two twin babies dying at birth. (AR 553.) Progress notes stated Plaintiff was tearful throughout the sessions, called the clinician the wrong name, and shared her feelings non-stop as she was anxious to share. (Id.) The other records show similar progress notes, continuing until June 30, 2016.

The Court finds these records support the ALJ's statement that Plaintiff was able to manage a variety of situational stressors without decompensation during the period of these records, and with conservative treatment with medication. Again, perhaps if taken in isolation, Plaintiff would have a stronger argument that this rationale is not a specific and legitimate reason, however, as part of the multiple reasons offered by the ALJ, the Court cannot find this was error. See Corthion v. Colvin, No. CV-15-00837-PHX-GMS, 2017 WL 68910, at *4 (D. Ariz. Jan. 6, 2017) ("The bulk of case law deals with conservative treatment vis-à-vis claimant credibility, rather than the weight due a treating physician's report, but the Ninth Circuit has discussed conservative treatment in the context of a treating physician's report's weight as recently as 2016, albeit in an unpublished case.") (citing Hanes v. Colvin, 651 F. App'x 703, 705 (9th Cir. 2016) ("In addition, the ALJ reasonably relied on his findings regarding Hanes's daily activities, her conservative treatment, and her positive response to that treatment to conclude that the assessments of Dr. Hawkins and Dr. Pena were inconsistent with the objective evidence in the record.")); see also Eblen v. Saul, 811 F. App'x 417, 419 (9th Cir. 2020) ("The ALJ properly gave little weight to Dr. Steven Maness's opinion that Eblen was disabled because it was inconsistent with the objective medical evidence, including Dr. Maness's own treatment notes, and because the record indicated that Dr. Maness had recommended conservative treatment.").

Finally, the Court also considers the support provided by the State agency physicians to

the ALJ's overall analysis of the evidence of Plaintiff's mental impairments.  The ALJ assigned great weight to the State agency physicians Young and Funkenstein:

> As for the opinions regarding the claimant's mental functioning, great weight is given to the determinations of the State agency psychological consultants, B. Young, M.D., who found the claimant had a mild limitation in activities of daily living, moderate limitations in social functioning and concentration, persistence, or pace, and no episodes of decompensation (Exhibits 2A, 3A) and on reconsideration, D. Funkenstein, M.D., found the same limitations and indicated the claimant had the ability to perform simple, routine, tasks with limited public contact (Exhibits B6A, B7A).  Great weight is given because the ability to perform simple tasks is consistent with the claimant's ability to comprehend the testing instructions without difficulty during her consultative examination, even though she put forth poor effort in her responses (Exhibit B10F at 10).  The undersigned has also credited the claimant's tearfulness during most of her therapy sessions when finding she is further limited to no contact with the public (Exhibits B8F, B11F).  It is again noted that the treating source statement submitted after this determination is not consistent with the need for a further reduction as there was little objective evidence other than the claimant's observed emotional state during therapy sessions (Exhibit B11F).  Notably the claimant was only taking a minimal dose of an anti-depressant to manage symptoms and was resistant to learning coping skills (Exhibits B6F at 34; B8F at 10).

(AR 33.)

Defendant argues that the ALJ properly relied on State agency physicians who assessed Plaintiff's mental condition (AR 102-108, 134-142), as Young and Funkenstein reasonably concluded from the review of the psychological records that Plaintiff's mental limitations were not significantly, mildly or moderately limited (AR 106-108, 140-42), and found that Plaintiff had mild restrictions in activities of daily living, moderate limitations in social functioning (in particular in the ability to interact appropriately with the general public), and moderate limitations in maintaining concentration, persistence, or pace, and no episodes of decompensation (AR 106-108).  (Opp'n 17-18.)  Young noted in making a credibility assessment, that Plaintiff's reported activities of daily living and Plaintiff's individual statements that she can only pay attention for two minutes were not supported by the medical evidence and were exaggerated (AR 103-104).  The ALJ did credit the Plaintiff's reported tearfulness during most of the therapy sessions when she was limited to no contact with the public, which was a greater limitation than that set forth by Young and Funkenstein (AR 33, 618-634, 681-732).  (Opp'n 18.)

Plaintiff did not address the assessments provided by Drs. Young and Funkenstein in

briefing.  The Court finds the ALJ properly relied on the opinions of state agency physicians Young and Funkenstein.  Given the consistency with other evidence identified by the ALJ, their opinions are also substantial evidence supporting the ALJ's evaluation of all of the medical evidence of record.  See Tonapetyan, 242 F.3d at 1149 ("Although the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record."); Sportsman, 637 F. App'x at 994–95 ("The ALJ th[o]roughly summarized the facts and conflicting evidence regarding Sportsman[']s physical limitations, including an extensive review of the medical opinions of Sportsman's treating physicians, stated his interpretation of the facts and conflicting evidence, and made findings accordingly . . . We find that the ALJ did not err in assigning substantial weight to the state agency medical consultant, whose opinion relied on and was consistent with the medical evidence of record.") (citing Tonapetyan, 242 F.3d at 1149).

Accordingly, in addition to the reasons discussed above that were specific and legitimate reasons for assigning reduced weight to Dr. Popper's opinion, the ALJ's review and analysis of all the evidence of mental impairments, and combining the various opinions and evidence into a reasonable RFC determination was not error, and was supported by substantial evidence in the record.

### B.     Whether the ALJ was Required to Consider a Closed Period of Disability

Plaintiff argues that, assuming "*arguendo* that the ALJ could correctly find that Plaintiff's functional capacity increased with improvement in her right shoulder following the close of her worker's compensation case, the ALJ failed to properly evaluate Plaintiff's limitations prior to that date."  (Br. 18.)  Plaintiff highlights that treating physicians routinely imposed restrictions of limited lifting, pushing, and pulling between 10 and 30 pounds, with no lifting above chest level on the right, and such limitations were imposed from October of 2013 through December of 2014.  (Br. 18-19, citing AR 249, 380, 401, 406, 414-15, 412, 417-18, 421, 423, 427, 436, 432-34, 450-51, 459.)  Plaintiff argues that even if the ALJ were correct to speculate that Plaintiff experienced reduced pain beyond these dates, the fact she ultimately

1   experienced a degree of improvement does not invalidate the medical evidence of record

2   establishing disability prior to that point.   (Br. 18.)   Plaintiff emphasizes that "the ALJ

3   discredited these opinions because they lacked a durational statement and because Plaintiff's

4   pain was eventually described as 'intermittent' . . . [h]owever, these reasons do not apply to the

5   time period during which these restrictions were persistently imposed following Plaintiff's

6   injury." (Br. 18.)   Plaintiff further argues the remainder of the ALJ's rationale in rejecting these

7   opinions is a lay interpretation of medical records, which is not a legitimate reason for rejecting

8   the treating physician's opinion.   (Br. 18.)   Therefore, the ALJ erred by failing to consider

9   whether Plaintiff was unable to perform medium work for the period from October of 2013

10  through December 2014, and was therefore disabled pursuant to Medical Vocational Guideline

11  Rule 202.09.

12          Defendant responds that the ALJ specifically relied on the medical expert opinions of the

13  State agency physicians J. Frankel, and G. Bugg, who assessed the relevant evidence during the

14  period in question and did not conclude that the medical evidence during the period conclusively

15  established Plaintiff was disabled as detailed by the worker's compensation providers.   (Br. 20,

16  citing AR 100-101, 117.)   Additionally, the ALJ found the objective imaging inconsistent with

17  the worker's compensation providers' limiting Plaintiff to no lifting, pushing, or pulling over 10

18  pounds.   (Br. 20, citing AR 32-33.)   Defendant also states the ALJ already considered Plaintiff's

19  functional status based on the medical evidence during the alleged closed period and prior to any

20  supposed improvement in Plaintiff's shoulder pain, and the ALJ cited to numerous treatment

21  records during the closed period that detailed Plaintiff had full range of motion and full strength

22  and this "calls into question Plaintiff's conclusory assertion that the medical evidence of record

23  established disability during that close[d] period, prior to any degree of improvement that she

24  may have experienced (AR 29 *citing* 420, 423, 426, 429)." (Br. 20.)   As an example, the ALJ

25  cited to Plaintiff's physical examination conducted by treating physician Michael J. Reynolds,

26  that revealed during the middle of the alleged closed period, Plaintiff displayed no shoulder

27  abnormalities on appearance, normal shoulder range of motion in all planes with pain with no

28  substantial difference in limits noted during either active or passing testing.   (Br. 20, citing AR

29, 426.)  Plaintiff did not address Defendant's arguments in the reply brief.  (ECF No. 17.)

The ALJ did not expressly consider a closed period of disability.  However, the ALJ's opinion expressly stated that to be disabled under the Social Security Act, the claimant must be unable to engage in any substantial gainful activity due to any medically determinable or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  (AR 22.) The ALJ found the evidence did not show how Plaintiff's impairments would limit the claimants functioning for a continuous period of 12 months or more.  (AR 25.)

As the Court found above, the ALJ properly considered the objective imaging results collectively (AR 29), and properly found the objective imaging inconsistent with the worker's compensation providers' limiting Plaintiff to no lifting, pushing, or pulling over 10 pounds, during the relevant time period.  (AR 32-33.)  The ALJ's citation to the record of intermittent shoulder pain was not the only reason given for rejecting the workers' compensation opinions. As explained above, the ALJ did not only assign reduced weight to Dr. Mochizuki's opinion, but addressed the workers' compensation opinions together and provided multiple reasons that the Court found to be specific and legitimate.  The Court found the ALJ's overall RFC assessment, both as to the physical and mental impairments, to be reasonable and supported by substantial evidence in the record, including the opinions of state agency experts whose opinions were reasonably found by the ALJ to be consistent with the overall medical evidence of record as a whole.

Accordingly, the Court does not find the ALJ erred in failing to consider a closed period of disability.  See Laib v. Astrue, No. CV-09-0142-CI, 2010 WL 2218294, at *3, 5 (E.D. Wash. May 26, 2010) ("Even if there are two rational interpretations of the evidence, the court may not substitute its judgment for that of the Commissioner . . . even if Plaintiff identifies evidence in the record that reasonably supports her argument that she was disabled for a closed period, the standard of review dictates that the Commissioner's decision be upheld if it is legally sufficient . . . [here the] ALJ's evaluation of the evidence and findings are supported by substantial evidence and free of legal error . . . the Commissioner's determination of non-disability is a reasonable

interpretation of the evidence, it must be affirmed [and] [b]ecause the ALJ found Plaintiff was not disabled at any time, *i.e.,* for a continuous period of twelve months, between January 2006 and February 2009, Plaintiff's argument that she is eligible for disability benefits for a closed period between January 2006 and October 2008 fails."); Little v. Berryhill, No. 1:16-CV-00846-SKO, 2017 WL 3601494, at *9 (E.D. Cal. Aug. 22, 2017)  ("Because the ALJ's evaluation of the evidence and findings that Plaintiff did not suffer an impairment for a continuous period of twelve months is supported by substantial evidence, it was not error for the ALJ not to consider Plaintiff's eligibility for a closed period of disability."); Broers v. Berryhill, No. 1:16-CV-00202-SKO, 2017 WL 1427025, at *10 (E.D. Cal. Apr. 21, 2017) ("Because the ALJ's evaluation of the evidence and findings that Plaintiff did not suffer an impairment for a continuous period of twelve months is supported by substantial evidence, it was not error for the ALJ not to consider Plaintiff's eligibility for a closed period of disability."); Rosales v. Colvin, No. CV-12-1550-PHX-GMS, 2013 WL 1410387, at *4 (D. Ariz. Apr. 8, 2013) ("Here, Rosales does not affirmatively set forth any evidence that supports a finding that he was disabled for at least twelve months.  Instead, he simply points out the fact that the evidence on which the ALJ relied occurred after a point in time that could be considered the end of a closed period of disability.  In fact, the ALJ's decision that Rosales was not impaired for a period of at least twelve months is supported by substantial evidence."); Felton v. Colvin, No. 2:15-CV-2315-CKD, 2016 WL 6803680, at *5-6 (E.D. Cal. Nov. 17, 2016) (finding "substantial objective medical evidence in the record from the closed period plaintiff asserts should be reconsidered supports the ALJ's determination that plaintiff was not disabled within the meaning of the Act for the duration of that period . . . The ALJ carefully and fully addressed this evidence in his decision and reached a reasonable determination that it did not warrant a finding that plaintiff was disabled, not only during the closed period plaintiff now contests, but throughout the entire course of the relevant period . . . Thus, the ALJ's RFC determination that plaintiff was capable of light work with some additional postural limitations throughout the course of the entire relevant period was supported by the substantial evidence.").

/ / /

1

2

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in evaluating the opinion of Dr. Mochizuki, did not err in evaluating the opinion of Dr. Popper, and did not err by failing to consider a closed period of disability.  The Court finds the ALJ's decision to be reasonable and supported by substantial evidence in the administrative record.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Dia Her Yang.  The Clerk of the Court is DIRECTED to CLOSE this action.

IT IS SO ORDERED.

Dated:   **September 30, 2020**

UNITED STATES MAGISTRATE JUDGE